**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Neil Mathew QUIGLEY, a/k/a Charles Atchley and Ted Roberts,**
**Defendants–Appellants.**

No. 80–1008.

United States Court of Appeals,
Fifth Circuit.
Unit A

Nov. 26, 1980.

Randy Taylor, Dallas, Tex., Stephen M. Stasio, Fort Worth, Tex., for defendants–appellants.

Kenneth J. Mighell, U.S. Atty., Gerhard E. Kleinschmidt, Asst. U.S. Atty., Fort Worth, Tex., for plaintiff–appellee.

Before THORNBERRY, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

The defendant Quigley was convicted of a violation of 18 U.S.C. (Appendix), § 1202(a)(1) (convicted felon in possession of a firearm). The offense charged occurred during a period in which Quigley had escaped from federal confinement resulting from his prior conviction for making a false statement to a bank. While escaped, Quigley had regained possession of a pistol owned by him; at the time of his arrest for the escape, the pistol was found under the mattress in the motel room in which Quigley was staying.

On appeal, Quigley principally contends: (1) that the present prosecution is barred as a result of a plea bargain made at the time of his plea of guilty to the escape charge based on his leaving federal confinement; and (2) that the pistol seized at the time of his arrest as an escapee should have been suppressed, as beyond the constitutionally permissible scope of a warrantless search incidental to an arrest, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Finding no error, we affirm.

(1) *Plea Bargain Issue*

The defendant Quigley escaped from federal confinement in Kansas. He pleaded guilty to the consequent escape charge filed against him in the federal District of Kansas. As the result of a plea bargain, he was sentenced to a nine month term to be served concurrently with his false–bank–statement sentence. At the time he pleaded guilty, the present firearm–possession charge had not been filed against him in the Northern District of Texas, in which his recapturing arrest had taken place. By motion made in the trial court prior to the present trial on the firearms charge, Quig-

ley contended that the Kansas plea bargain was intended to preclude any federal prosecution and punishment other than the nine–month concurrent sentence received on his guilty–plea to the escape charge.

■ Quigley thus contends that prosecution on the present charge in the Texas district is barred because the government is bound by its plea bargain in the Kansas district, by reason of which the sentence received on the Kansas guilty plea would satisfy Quigley's entire criminal liability for his escape. See *United States v. Cain*, 587 F.2d 678 (5th Cir. 1979); see also *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). This is the issue raised by the defendant's trial motion, although incorrectly couched in terms of double jeopardy. See *United States v. Solano*, 605 F.2d 1141, 1142–43 (9th Cir. 1979). The content of a plea bargain agreement is a factual issue concerning which, on appeal, the trial court's determination should not be set aside unless clearly erroneous, *United States v. Cain, supra.*

■ Here, the evidence taken before the trial court at an evidentiary hearing is virtually undisputed. Both Quigley and his then–attorney testified that they believed that his plea to the escape charge was intended to preclude prosecution on the firearms charge.[1] However, Quigley's attorney frankly admitted that the matter was not discussed with the prosecutor and that, because the firearms–charge had not yet been filed, he merely assumed that the bargained–for concurrent sentence on the Kansas escape charge included as well non–prosecution on the (unfiled) Texas firearms charge. The Kansas prosecutor corroborated that no discussion took place beyond the bargaining on the length of the concurrent sentence if Quigley pleaded guilty to the escape charge; he further testified that he did not even know that Quigley had been found in possession of a firearm at the time of his Texas arrest, since the arrest information forwarded to him was silent as to this fact.

---

1. Whatever relevance this testimony may have had to attempt to vacate as unknowing the escape guilty–plea, Quigley does not here at-

tack that conviction. He simply wishes to bar the present firearm–possession prosecution by virtue of the alleged–escape plea agreement.

Under these circumstances, we find no error in the district court's factual finding that the Kansas plea bargain did not include non–prosecution on the Texas firearms charge. In the absence of inquiry by defense counsel, or of knowledge by the prosecutor that an additional charge might be filed in the other district, the latter was not obliged to clarify that the plea bargain concerned only the escape charge pending in his own district and did not concern non–prosecution on charges pending or to be filed in another district.

### (2) *Motion to Suppress the Firearms*

The defendant Quigley further argues, however, that the pistol that is the basis of this prosecution was seized as the result of an unconstitutional search at the time of his arrest. He points out that, after his arrest, one of the two–to–three armed FBI agents in the room at the time located the pistol underneath a mattress in a bed far beyond his reach, he at the time being naked, arms handcuffed behind him, and placed against the wall under armed guard. Quigley thus contends that his motion to suppress the pistol was improperly denied, because as in *Chimel v. California, supra,* the search "went far beyond the [arrestee's] person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him", *Id.* at 395 U.S. 768, 89 S.Ct. at 2043, 23 L.Ed.2d 685, and that it therefore exceeded the constitutionally permissible scope of a search incident to a lawful arrest. Cf. *United States v. Jones,* 475 F.2d 723, 727–28 (5th Cir. 1973).

For reasons to be more fully explained, we do not find merit to Quigley's contention. Essentially, we conclude that the search, which took place within seconds of the arrest, was not unreasonable within the contemplation of the Fourth Amendment: For their own safety, the officers reasonably acted to locate immediately firearms in the room, reasonably believed to be possessed by Quigley at the time of his arrest; especially since in the room with him at the time was a female reasonably believed to be his accomplice.

After detailing (a) the circumstances of arrest below, we will note (b) the legal principles that justify our conclusion.

### (a) *The circumstances of the arrest*

The FBI agents of the area were attempting to locate Quigley in order to arrest him as a fugitive escapee. They were monitoring the telephone of a former girl friend, whom he had contacted and whose residence he had earlier entered and taken from it his pistol, which she had been keeping for him during his federal incarceration. Shortly before the arrest, by tracing a telephone call made to her by Quigley, they had learned that he was in a motel room in the area.

Four FBI agents proceeded to the motel. Two or three of them stationed themselves outside the motel room. One of them telephoned the room and told a girl, who answered the call, to have Quigley open the door. He did so, and two of them armed respectively with a shotgun and a drawn revolver, immediately came through the door, handcuffed Quigley's arms behind his back, and placed him against the wall. Quigley was completely naked at the time. He was emotional and crying, obviously frightened.

A girl (Charlotte A.) was in the room with Quigley. She was sitting in a chair five feet from one of the two beds in the room. One of the FBI agents asked her if there was a gun in the room. She replied in the affirmative and pointed to a bed. The agent reached underneath the mattress and found the pistol, possession of which is the basis of the present charge against Quigley. The girl estimated that the entire incident from entry to finding of the pistol took place within 45 seconds—corroborating the FBI agent–witness's estimate of the discovery of the pistol taking place "within seconds" of the arrest.

At the time the FBI agents entered the room to arrest Quigley, they (a) had reasonable cause to believe that he was armed and (b) knew that he apparently was being aided and abetted in his escape by a white

female, Tr. 209, presumably (and actually [2]) the girl (Charlotte A.) found in the motel room with him. An additional circumstance that we find somewhat pertinent to our eventual conclusion that the effort to find the gun was primarily undertaken by the officers to protect their own safety, rather than a *Chimel*–prohibited warrantless search for incriminating evidence beyond that reasonably incident to the arrest, is that Quigley himself was obviously emotional and distraught and not in command of himself. Although immobilized against the wall after the arrest, just before Quigley opened the door to admit the FBI agents, "[h]e was running around yelling, don't hurt me, and kind of running into things and falling down", according to the girl in the room with him.

### (b) Legal principles applicable

*Chimel* defined the constitutionally permissible scope of a search incident to a lawful arrest. It limited the search, insofar as merely incident to the arrest, to the person of the arrestee and to the area from within which he might have obtained either a weapon or incriminating evidence. The thrust of the opinion, as its discussion of the prior jurisprudence reveals, was to limit the *advertent* warrantless search, at the time of the arrest, to the area of the premises within the arrestee's immediate control. Prior to *Chimel*, the traditional exception to the necessity of a warrant—when a search was "incident" to a lawful arrest—had been judicially extended to include the entire premises in which the arrest took place.

However, as the subsequent jurisprudence has made clear, *Chimel* was not intended to bar admission under all circumstances of evidence discovered at the time of arrest in an area beyond the *Chimel* –limited scope of search incident to the arrest: the evidence may nevertheless be admissible, although discovered at the time of the arrest *beyond* that area, if found— not as the result of a search sought to be justified merely as incident to the arrest, but—under circumstances that do not offend the Fourth Amendment's command against unreasonable searches and seizures.[3]

For example, in *United States v. Cueto,* 611 F.2d 1056, 1062 (5th Cir. 1980), evidence in plain view at the time of the arrest was held to be properly seized. However, searches in an arrestee's suitbag and between the mattresses in the motel room in *Cueto* were held to be impermissible under *Chimel.* Conceding that *Cueto's* rationale for suppressing the latter evidence might seem to furnish adequate basis for a similar suppression in the present instance,[4] we nevertheless note that the sole basis for the *Cueto* search was as incident to the lawful arrest. The decision did not concern the discovery of evidence found as the result of the arresting officers taking reasonable precautions for their own safety, as does the present case.

The present search, distinguishably from that in *Cueto,* is thus generically similar to the cursory safety check recognized

---

2. Wittingly or unwittingly, Charlotte A. had aided Quigley's escape from the Kansas institution by sending him an airline ticket to Texas. During four–six days following Quigley's arrival in Texas, she had sheltered him in her cottage and afforded him the use of credit cards by which he had obtained clothes and rental cars. She had driven with him from Houston to the Dallas–Fort Worth area, where the arrest occurred, and had spent the previous night with Quigley in the motel room.

3. The discussion of the post–*Chimel* jurisprudence in Kamisar, LaFave, and Israel, Modern Criminal Procedure 275–83 (4th ed. 1974), discusses some of the post–*Chimel* situations in which evidence thus discovered was held despite *Chimel* to be admissible, such as, for example: the *inadvertent* discovery of evidence (a) while attempting to locate and arrest the defendant known to be on the premises, or (b) after arrest, while accompanying the defendant as he gets dressed, or (c) as the officers are acting for their own protection, or (d) while searching for other offenders reasonably believed to be on the premises.

4. *Cueto* held that the search of the suitcase and underneath the mattress was improper under *Chimel* because the defendants (who were handcuffed and may have been removed from the motel room at the time) "were certainly in no position to reach concealed weapons or to grab and destroy evidence in the suitbag or between the mattresses." 611 F.2d at 1062.

as permissible, beyond the *Chimel* scope, where there is probable cause to believe a serious threat to safety of the arresting officers is presented. *United States v. Smith*, 515 F.2d 1028 (5th Cir. 1975). There, like the present, the suspect was reasonably believed to be armed, while a person believed to be his accomplice was present at the scene of the arrest. Recognizing that the reviewing court should "strictly scrutinize such alleged precautionary searches" in order to assure itself that there really existed "a serious and demonstrable potentiality for danger", 515 F.2d at 1031, the *Smith* panel held that such criteria were met under the circumstances there presented.

Subjecting to strict scrutiny (as required by *Smith*) the pretext for the present post–arrest search beyond *Chimel* bounds, we likewise are assured that the safety check for the weapon was a reasonable precautionary search in the face of a serious and demonstrable potentiality for danger to the arresting officers. The suspect was reasonably believed to be armed, and the girl in the room with him was reasonably believed to be his accomplice. At the time the arresting officer asked the girl where the weapon was located, she herself was sitting unrestrained in a chair. In the light of hindsight, we know that the pistol underneath the mattress was beyond both her reach and that of the handcuffed arrestee Quigley; however, at the time of the arrest and of the query, for all the officers knew the weapon was within reach of the girl or, even, of Quigley. The circumstance that the search took place within seconds of the arrest is further support for the conclusion that the attempt to locate the firearm was a reasonable and cursory check to protect the safety of the officers, rather than a post–arrest search beyond *Chimel's* permissible scope in order to obtain incriminating evidence.

See: *United States v. Campbell*, 575 F.2d 505 (5th Cir. 1978) (precautionary search of jacket worn by arrestee before handing it to him); *United States v. Wysocki*, 457 F.2d 1155 (5th Cir. 1972) (precautionary search of box in which weapon was reasonably expected to be located). See also: *United States v. Williams*, 454 F.2d 1016 (D.C. Cir. 1972) (precautionary search under mattress when suspect and his accomplice reasonably believed to be armed); *United States v. Manarite*, 448 F.2d 583 (2nd Cir. 1971) (firearms already found present, search of end table near which several unrestrained individuals were standing who were reasonably believed to be accomplices of the arrestee).

*Conclusion*

Accordingly, we affirm the conviction appealed from.

AFFIRMED.